**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**WOODZELL HARRIS, JR.**                                                                    **PLAINTIFF**

**v.**                                        **Case No. 4:16-cv-00701-KGB**

**CITY OF LITTLE ROCK**                                                              **DEFENDANT**

## OPINION AND ORDER

Plaintiff Woodzell Harris, Jr., brings this action under Title VII of the Civil Rights Act of 1964, as amended, ("Title VII"), 42 U.S.C. § 2000e, alleging race, color, and religious discrimination and retaliation. Defendant City of Little Rock ("City") has filed a motion for summary judgment, seeking judgment in its favor on Mr. Harris's claims (Dkt. No. 18). Mr. Harris has filed no response in opposition, and the time for filing a response has passed. For the reasons that follow, the Court grants the City's motion for summary judgment and enters judgment in favor of the City on Mr. Harris's discrimination and retaliation claims.

## I.      Factual Background

The following facts are taken from the City's statement of uncontested facts (Dkt. No. 19). Mr. Harris did not file a response admitting or denying specifically the facts in the City's statement of uncontested facts as required by Local Rule 56.1 of the Local Rules of the United States District Court for the Eastern and Western Districts of Arkansas. For this reason, the Court accepts as true the City's statement of uncontested facts, where supported by the record or not specifically contested by Mr. Harris, to resolve this motion. *See Robinson v. American Red Cross*, 753 F.3d 749, 754-55 (8th Cir. 2014).

The City employed Mr. Harris as an Information Support Specialist ("ISS") within the Network Services Division beginning on January 17, 2012 (Dkt. No. 19, ¶ 3). His salary at hire

was $33,000.00, commensurate with education and experience (*Id*.). During Mr. Harris's employment with the City, his supervisor received complaints about Mr. Harris's job performance from various sites assigned to him (*Id*., ¶ 4).

From August 2013 through 2014, Mr. Harris and the other technicians were assigned to upgrade all machines to Office 2010 or Office 2013 to move users to a new server (*Id*.). The upgrade was necessary for users to access their email (*Id*.). During that time, the Information Technology ("IT") Department received complaints regarding Mr. Harris about the updates not having been performed, resulting in the inability of users to receive email (*Id*.). The complaints concerned incomplete documentation or unresolved issues during this time (*Id.*, ¶ 4).

On June 12, 2014, Mr. Harris was reassigned from the landfill ("Scale House") site after the site manager complained about Mr. Harris and requested another technician be assigned (*Id*., ¶ 5). Mr. Harris failed to communicate, document, and address problems at this site despite numerous opportunities to do so (*Id*.). On July 21, 2014, the Police Training Division requested that another technician be assigned to its area after receiving several user complaints that issues were not resolved, that promises to return were not honored, and that data was lost (*Id*., ¶ 6). In some cases, the issues were not documented, and in other instances, explanations did not match the documentation or complaints of the user (*Id*.).

Mr. Harris disputes that "legitimate" complaints were filed about his job performance at his various job sites (Dkt. No. 18-7, at 53). He contends instead that any complaints received by vendors or job sites were the result of his supervisor Melissa Bridges soliciting negative information about his performance through email (*Id*., at 53-54, 56, 58).

On November 3, 2014, Mr. Harris was issued a letter of counseling after complaints were received from the City of Little Rock Fleet Maintenance Manager (Dkt. No. 19, ¶ 7). This letter

was subsequently removed from Mr. Harris's file after he appealed and prevailed on the internal appeal (*Id.*). As part of the internal appeal, Mr. Harris lodged a grievance against his supervisors Ms. Bridges and Bobbie Curry-Phillips alleging harassment (*Id.*, ¶ 8).[1] On March 20, 2015, Director of Human Resources ("HR") Stacy Witherell concluded that Mr. Harris was unable to substantiate his complaints of inappropriate comments made by his supervisors (*Id.*). Ms. Witherell concluded that Mr. Harris was unable to provide sufficient details of when the events allegedly occurred and to identify witnesses to the alleged events (*Id.*). Mr. Harris contends that the matter was closed without a proper investigation (Dkt. No. 2, ¶¶ 8, 9).

Mr. Harris appealed the grievance determination to the City Manager Bruce T. Moore (Dkt. No. 19, ¶ 8). Mr. Moore addressed all complaints concerning Ms. Bridges and Ms. Phillips (*Id*). Mr. Harris claimed that Ms. Bridges harassed him by reassigning him from the Scale House and Police Training sites (*Id.*). Mr. Moore found that Mr. Harris's reassignment was driven by written and verbal complaints from personnel and vendors at those locations (*Id.*). As to Mr. Harris's complaint of mental and verbal abuse from Ms. Bridges, Mr. Moore found that multiple employees were interviewed and that no one could substantiate Mr. Harris's allegations that he was singled out and verbally berated (*Id.*). Based on the information provided, Mr. Moore denied Mr. Harris's appeal and upheld the recommendation of the HR Department (*Id*). Mr. Harris alleges that, three months after his appeal to Mr. Moore, his job area was changed, and two months later, his work load was cut in retaliation (Dkt. No. 2, ¶ 9). The City disputes that Mr. Harris's job area and workload were changed as the result of his complaints or his appeals filed with the City (Dkt. No. 11, ¶ 9).

---

[1] Mr. Harris states in his deposition that he does not recall filing a grievance against Ms. Phillips and that Ms. Phillips "just happened to be caught in the middle of it." (Dkt. No. 18-7, at 48).

On February 10, 2016, Ms. Phillips, Mr. Harris's immediate supervisor, began the process for a classification review and salary/pay increase for the position of ISS pursuant to a request by Director for IT Randy Foshee (Dkt. No. 19, ¶ 18). Jim Kimbrough, Lance Chambers, John Junkins, William Schmidt, and Mr. Harris were employed as ISS (*Id*.). Ms. Phillips requested and received classification review request forms from Mr. Kimbrough, Mr. Chambers, Mr. Junkins, and Mr. Harris (*Id*.). Mr. Schmidt, who had been employed less than one month at that time, opted to forego input but signed off on the request (*Id*.).

On February 16, 2016, during the IT bi-weekly ISS meeting and with all ISS present, Ms. Phillips emphasized the need to complete the classification review forms and answered questions regarding the process (*Id*.). The same day, Director Foshee and Ms. Phillips met with the Mr. Harris at his request to address concerns regarding his pay (*Id*)

On February 29, 2016, Ms. Phillips met with Director Foshee and reviewed and compared IT job descriptions and the responses provided by the ISS on the completed forms (*Id.*, ¶ 18). The forms needed to be modified to reflect only the changes to ISS job functions (*Id*.). On March 1, 2016, during the IT bi-weekly meeting, Ms. Phillips requested that the ISS modify the forms and return to her by March 4, 2016 (*Id*.). On March 4, 2016, Ms. Phillips asked Director Foshee if the ISS could be given until March 7, 2016, so that they could have the weekend to complete the forms (*Id*.). Ms. Phillips was out on March 7, 2016, but Director Foshee collected all of the modified forms from the ISS that day (*Id*.). Director Foshee and Ms. Phillips met again on March 11, 2016, to go over the modified paperwork and to prepare to submit the requests (*Id*.).

On March 15, 2016, during the IT bi-weekly meeting, the ISS raised concerns that the reclassification process would not result in a salary increase and inquired if there were other steps that could be taken (*Id*.). Ms. Phillips communicated that she had drafted a memorandum

requesting a salary increase and would send it to the appropriate personnel (*Id*.). Ms. Phillips allowed the ISS to read the draft memorandum during the meeting (*Id*).

On March 23, 2016, Director Foshee submitted the FORM HR-2A ("Classification Review Request") to Ms. Witherell (*Id*.). The Classification Review Request included a review of the ISS job description highlighted to identify additions, deletions, or modifications as a result of the review done with the ISS, Ms. Phillips, and Director Foshee (*Id*.). Ms. Phillips also forwarded to Director Foshee a copy of the memorandum entitled "Request for Salary – Pay Increase" dated March 16, 2016, to include with the Classification Review Request submission (*Id*.). Ms. Phillips then officially emailed the memorandum to Director Foshee and Ms. Witherell, carbon copied to Ms. Bridges, Mr. Kimbrough, Mr. Chambers, Mr. Junkins, Mr. Schmidt, and Mr. Harris (Dkt. No. 19, ¶ 18). During the process and up until submission, all ISS were involved in formulating the version of the Classification Review Request that was submitted to HR on March 23, 2016 (*Id*). It is unclear from the record what resulted from Director Foshee's submission of the Classification Review Request and accompanying memorandum.

Mr. Harris contends that the City failed to give him a classification review (Dkt. No. 2, ¶¶ 8, 9). He further contends that the City failed to investigate his complaint about department job title pay (*Id*.). The City disputes these allegations and denies that it failed to investigate any complaint regarding classification review and department job title pay (Dkt. No. 19, ¶ 18). Mr. Harris contends that he has "raised questions and asked several times for Classification Review" (Dkt. No. 2, ¶ 9). Mr. Harris asserts that he has requested several meetings with Mr. Moore and that he has made "several FOI requests" (*Id*.). The City does not dispute that Mr. Harris has made several Freedom of Information ("FOI") requests but asserts that all requests have been responded to or are being responded to in accordance with Arkansas laws (Dkt. No. 11, ¶ 9).

On June 7, 2016, Ms. Phillips, Mr. Harris's immediate supervisor, saw a "RecentPlaces" shortcut link at the top of the directory on the Little Rock Information Technology ("LRIT") fileshare3 which was not something typically seen at the top of the directory (Dkt. No. 19, ¶ 9). She conferred with April Prewitt and Mr. Chambers, other LRIT personnel, to see if they could also see the link and to see if the functionality was the same when they accessed it (*Id*.). Ms. Phillips informed her supervisor and Network Security Manager Ms. Bridges of the shortcut (*Id*.). On June 8, 2016, Ms. Bridges forwarded an email to Director Foshee concerning the shortcut link which caused security concerns (*Id*., ¶ 10). Director Foshee instructed Ms. Bridges by phone to conduct an investigation of the link and to speak with HR about the issue (*Id*.). Ms. Bridges spoke with the Senior HR Analyst for Labor Relations Leslie Cloer (*Id*., ¶ 11). Ms. Bridges in turn updated Director Foshee on the ongoing investigation and the recommendation of HR to place Mr. Harris on administrative leave with pay pending the outcome of the investigation (*Id.*, ¶ 10).

Ms. Bridges and Acting Director for LRIT Jeff Ralston then spoke with Mr. Harris about the shortcut link and informed him that audit logs confirmed that Mr. Harris's computer had created the link and that the link had been accessed by Mr. Harris while doing work for the Fleet Department (*Id*., ¶ 11). Mr. Harris initially denied creating the shortcut link and then suggested that someone else may have used his credentials to create the link (*Id*.). The City contends that Mr. Harris then admitted that he might have created the link so that he could easily access things he needed to do for work (*Id*.). Mr. Harris disputes creating the shortcut link on the fileshare3 server (Dkt. No. 18-7, at 36). He contends that either Ms. Bridges placed the link in the directory or had someone else do it (*Id*., at 45).

On June 9, 2016, Ms. Bridges and Ms. Cloer met with Assistant City Manager James Jones and decided that Mr. Harris would be put on administrative leave with pay pending the outcome

of the investigation into the shortcut link (Dkt. No. 19, ¶ 11).  In accordance with City policy, Mr. Harris would be required to turn over temporarily all City-issued property, and his account access would be locked until the investigation was completed (*Id.*).  Ms. Bridges and Ms. Cloer then met with Mr. Harris at the IT conference room, informed him that he would be placed on administrative leave with pay, and requested that he turn in all City-issued property, including his City-issued cell phone (*Id.*).

Mr. Harris refused to relinquish the cell phone and demanded to get his personal files off of the phone (*Id.*, ¶ 12).  According to the City, Mr. Harris yelled, "What's wrong with you?" (*Id.*).  He then proceeded toward his cubicle (*Id.*).  Ms. Bridges and Ms. Cloer followed Mr. Harris to his cubicle, repeatedly asking for the cell phone and informing Mr. Harris that it was City property that did not belong to him (*Id.*). Ms. Bridges and Ms. Cloer entered the cubicle and continued to request the cell phone (*Id.*).  Mr. Harris plugged the cell phone into his personal laptop and began removing files from the cell phone onto his laptop (*Id.*).  According to Ms. Bridges, Mr. Harris did not copy the files; he moved the files so they no longer remained on the device (*Id.*).  Ms. Bridges told Mr. Harris "hand the phone over now" (*Id.*).  Ms. Cloer stated, "Woody [Mr. Harris], that was a direct order, give Ms. Bridges your phone" (*Id.*).  Mr. Harris attempted to leave the office, telling Ms. Bridges, "You gonna get out of my way missy" (*Id.*).  Mr. Harris does not dispute that statement but clarifies that "sometimes Missy is short for Melissa." (Dkt. 18-7, at 17).  Mr. Harris, carrying the laptop, laptop bag, and cell phone, charged into Ms. Bridges so she bumped back into Ms. Cloer, knocking both women backwards (Dkt. No. 19, ¶ 12).

Mr. Harris disputes that he made contact with Ms. Bridges (Dkt. No. 18-7, at 20-21).  He contends that he feared for his safety in the cubicle and feared that Ms. Bridges would lie about the incident to retaliate against him for filing a grievance against her (*Id.*).  Mr. Harris proceeded

to climb onto his desk and over the wall of the cubicle with both his personal laptop and the City-issued cell phone, stating, "We're gonna go see the mayor. We're gonna go see Bruce." (Dkt. No. 19, ¶ 12). He then exited the building as Ms. Bridges and Ms. Cloer both repeatedly asked him to turn over his phone because it was City property (*Id*.).

On June 27, 2016, Director Foshee issued a Non-Uniform Employee Disciplinary Action Form Record of Termination which terminated Mr. Harris for "insubordination: breach of confidence and security and conduct which adversely affects an employee's ability to continue to do his job" pursuant to the City of Little Rock Administrative Personnel Policy and Procedure Manual, Termination Process (*Id*., ¶ 13).

On July 14 and July 26, 2016, the HR Department conducted appeal hearings on Mr. Harris's termination (*Id*., ¶ 14). The hearings were held before a designated hearing officer who heard testimony and reviewed the evidence (*Id*.). Mr. Harris was represented by an attorney who questioned witnesses and offered argument to the hearing officer (*Id*.). The hearing officer recommended to Mr. Moore that the termination be upheld (*Id.*, ¶ 14). On August 3, 2016, Mr. Moore issued a letter to Mr. Harris upholding the decision to terminate his employment (*Id*.). Mr. Moore's original letter had the incorrect date of infraction and was corrected by a subsequent letter to Mr. Harris (*Id*.). On June 30, 2016, Mr. Harris filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination on account of his race, color, and religion and retaliation (Dkt. No. 2, ¶¶ 6, 8, 9). The EEOC issued to Mr. Harris a Notice of Right to Sue on July 2, 2016 (*Id*., ¶ 7).

Mr. Harris argues that he was "accused of something they have admitted I didn't do, but fired for not given up my phone fast enough, it was clearly a setup. I have been discriminated against & I have suffered retaliation." (Dkt. No. 2, at 3). The City specifically denies any and all

allegations of retaliation and denies that Mr. Harris's employment was terminated because he failed to turn in his City issued equipment or his phone "fast enough" (Dkt. No. 11, ¶ 9).

Mr. Harris contends circumstantially that he often quoted Bible scriptures and had an email signature quote of a Bible scripture that he was asked to remove (Dkt. No. 19, ¶ 15). Director Foshee sent an email to all IT employees concerning proper content for email signature blocks (*Id.*). In response to that email, Mr. Harris removed the Bible scripture from his signature block (Dkt. No. 18-7, at 81). He does not identify any other employee who was treated differently in regard to religious content in email signature blocks (Dkt. No. 19, ¶ 15).

Mr. Harris asserts the following causes of action against the City: (a) termination of employment because of race; (b) termination of employment because of color; (c) termination of employment because of religious beliefs; (d) discrimination in promotion because of race, color, and religion; (e) failure to investigate complaints of harassment by supervisors; (f) failure to conduct a classification review; (g) failure to investigate department job title pay; and (h) retaliation by the City for his complaints to the Assistant City Manager (Dkt. Nos. 2, ¶ 8; 18, ¶ 2). On September 15, 2017, the City filed its motion for summary judgment, seeking judgment on all of Mr. Harris's claims. Mr. Harris has not responded. The motion for summary judgment is now ripe for review.

## II.    Standard of Review

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).

"The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law." *Hollway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989). However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"There is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc). Accordingly, this Court applies the same summary judgment standard to discrimination cases as it does to all others.

### III.     Analysis Applicable To Discrimination Claims Generally

Mr. Harris can establish a *prima facie* case of discrimination either by providing direct evidence of discrimination or by creating an inference of unlawful discrimination under the three-step analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *Bone v. G4S Youth Services, LLC*, 686 F.3d 948, 953 (8th Cir. 2012). Direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action. *Torgerson,* 643 F.3d at 1043-44 (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004)). Therefore, "direct" refers to the causal

strength of the proof, not whether it is "circumstantial" evidence. *Id.* A plaintiff with strong direct evidence that illegal discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas* analysis to get to the jury, irrespective of whether his strong evidence is circumstantial. *Id.* However, "if the plaintiff lacks evidence that clearly points to the presence of an illegal motive, he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the *McDonnell Douglas* analysis, including sufficient evidence of pretext." *Id.* (quoting *Griffith*, 387 F.3d at 736).

## A.      Direct Evidence Analysis

"To be entitled to direct evidence analysis, the plaintiff must present evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the fact finder to infer that that attitude was more likely than not a motivating factor in the employer's decision." *Rivers-Frison v. Se. Mo. Cmty. Treatment Ctr.*, 133 F.3d 616, 619 (8th Cir. 1998) (internal quotation marks omitted). Mr. Harris presents no direct evidence of discrimination in support of any of his claims. Accordingly, the Court will proceed through the *McDonnell Douglas* analysis.

## B.      *McDonnell Douglas* Analysis

Under the *McDonnell Douglas* analysis, "the plaintiff bears the burden of establishing a *prima facie* case of discrimination." *McGinnis v. Union Pac. R.R.*, 496 F.3d 868, 873 (8th Cir. 2007). If a plaintiff makes out a *prima facie* case, he creates a presumption of unlawful discrimination, and the burden shifts to the defendant to come forward with evidence of a legitimate nondiscriminatory reason for its actions. *Id.* If the defendant articulates such a reason, the burden returns to the plaintiff to show the defendant's proffered reason is pretextual and that unlawful discrimination was the true reason for the adverse employment action. *Tyler v. Univ. of*

*Ark. Bd. of Trustees*, 628 F.3d 980, 990 (8th Cir. 2011). Pretext may be demonstrated by different means. *See, e.g., Roxas v. Presentation College*, 90 F.3d 310, 316 (8th Cir. 1996).

## IV.     Race Discrimination Claims

Mr. Harris alleges race discrimination based on the City's alleged failure to promote him, alleged failure to investigate his complaints against his supervisor, alleged failure to address adequately his complaints about his job title and pay, and termination of him. The Court examines these claims applying the *McDonnell Douglas* analysis.

Specific to Mr. Harris's failure to promote claim, to establish a *prima facie* case of race discrimination when alleging a failure-to-promote claim, Mr. Harris must show that: (1) he is a member of a protected group; (2) he was qualified and applied for a promotion to an available position; (3) he was rejected; and (4) similarly situated employees, not part of his protected group, were promoted instead. *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1086 (8th Cir. 2011). The City does not dispute that Mr. Harris is a member of a protected group. The Court assumes without deciding for the purposes of resolving the pending motion for summary judgment that Mr. Harris was qualified and applied for a promotion to an available position. Even with this assumption, Mr. Harris fails to establish a *prima facie* case because he cannot show that similarly situated employees outside of his protected group were promoted instead. Based on the record evidence before the Court, Mr. Harris admitted that there were similarly situated Caucasian employees with more seniority and equal education who were not promoted (Dkt. No. 18, Ex. G, Harris Dep., at 86-95). In fact, he identified only one employee who he contends had less education and was promoted instead of him; the employee is African American (*Id.*).

To establish a *prima facie* case of race discrimination based on his complaints of different treatment and termination, Mr. Harris must show that: "(1) he is a member of a protected class,

(2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination (for example, similarly situated employees outside the protected class were treated differently)." *Young v. Builders Steel Co.*, 754 F.3d 573, 577 (8th Cir. 2014) (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853-54 (8th Cir. 2012)). The City, for purposes of this motion, does not dispute that Mr. Harris is a member of a protected class (Dkt. No. 20, at 12). The City also does not dispute that Mr. Harris was meeting the City's legitimate job expectations (*Id.*). Instead, the City maintains that Mr. Harris has failed to provide any record evidence of a similarly situated employee outside the protected class who was treated differently or whose comparable behavior did not lead to termination of employment. The Eighth Circuit Court of Appeals has set a "'low threshold' for employees to be considered similarly situated" at the *prima facie* stage, "requiring only that the employees 'are involved in or accused of the same or similar conduct and are disciplined in different ways.'" *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 851 (8th Cir. 2005) (quoting *Wheeler v. Aventis Pharms.*, 360 F.3d 853, 857 (8th Cir. 2004)), *abrogated on other grounds by Torgerson*, 643 F.3d at 1031).

The City is entitled to judgment as a matter of law in its favor on Mr. Harris's claims of race discrimination arising from his allegations of different treatment and his termination. In regard to his claims of different treatment, Mr. Harris has not established that the City failed to investigate his complaints against Ms. Bridges and Ms. Phillips or that any alleged failure was based on race. The record evidence demonstrates that his complaints were investigated, that he appealed the preliminary determination regarding that investigation, and that the preliminary determination was upheld after further review (Dkt. No. 18, Exhibit A, Moore Aff., ¶¶ 4-5; Exhibit

B, Foshee Aff., ¶¶ 7-8; Exhibit F, Witherell Aff., ¶ 5). Mr. Harris has not shown how this action was purportedly deficient or discriminatory based on race.

As it relates to his claim that the City did not conduct a classification review or provide to him a salary or pay increase for his position, Mr. Harris cannot establish a *prima facie* case of race discrimination. The record evidence demonstrates that, on February 10, 2016, Ms. Phillips was asked by Director Foshee to begin the process for classification review and evaluating salary and pay increases for the position of ISS (Dkt. No. 18, Exhibit E, Phillips Aff., ¶ 3). Several individuals held this position, including Mr. Harris (*Id*.). This process involved several steps, took time, and included input from and actions on behalf of many individuals, including Mr. Harris (*Id*.). The record indicates that there were no results or feedback from HR regarding this request prior to the events of June 9, 2016, and Mr. Harris's termination (*Id*.). For these reasons, the Court concludes that Mr. Harris has failed to establish a *prima facie* case of race discrimination based on the City's classification review and salary or pay evaluation.

Further, as to all of his race discrimination claims, Mr. Harris has not shown that similarly situated employees outside the protected class were treated differently. His complaint identifies no similarly situated comparators, and he has not provided record evidence of any examples of similarly situated comparators in response to the City's motion for summary judgment.

Mr. Harris identifies one individual — Greg Marshall — who he claims was promoted when Mr. Harris was not (Dkt. No. 18, Exhibit G, Harris Dep., at 86). To make such a claim, Mr. Harris must show that the other employee was "similarly situated in all relevant respects." *Young*, 754 F.3d at 578 (quoting *Chappell v. Bilco Co.*, 675 F.3d 1110, 1119 (8th Cir. 2012)). Mr. Harris admits that Mr. Marshall is also African-American (Harris Dep., at 86). Based on the record

evidence before the Court, Mr. Harris has failed to identify one individual outside the protected class who was promoted when Mr. Harris was not.

Similarly, Mr. Harris in his deposition discusses one employee whom he contends was similarly situated and outside the protected class. Mr. Harris asserts that Mr. Chambers was treated differently for the same offense of insubordination (Dkt. No. 18, Exhibit G, Harris Dep., at 85-86). Mr. Harris suggests that Mr. Chambers was suspended and sent home, not terminated, for his insubordinate conduct at the City (*Id*.). However, Mr. Harris provides no record evidence regarding the circumstances of that incident. Without evidence as to the circumstances of that incident, a reasonable juror could not conclude that the treatment of that employee by the review board supports finding disparate treatment of Mr. Harris based on race. Mr. Harris has not carried his burden to establish a *prima facie* case of race discrimination in relation to either the failure to promote or termination allegations or any other allegations of race discrimination.

Even if Mr. Harris could establish a *prima facie* case of race discrimination, in regard to his termination claim, the City has articulated a legitimate, nondiscriminatory reason for his termination — the cell phone incident on June 9, 2016. *See Young*, 754 F.3d at 577-78. The City has articulated legitimate, nondiscriminatory reasons for the other actions Mr. Harris alleges it took. At this stage then, "the presumption of discrimination disappears, and plaintiff is required to prove the proffered justification is merely pretext for discrimination." *Id*., at 578. "At the pretext stage, the test for determining whether employees are similarly situated to a plaintiff is a rigorous one." *Bone*, 686 F.3d at 956 (quoting *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 853 (8thCir. 2005)) (internal quotation marks omitted). The potential comparators "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Id.* (quoting *Clark v. Runyon*,

218 F.3d 915, 918 (8th Cir. 2000)). For the reasons discussed above and based on the record evidence before the Court, Mr. Harris cannot meet this rigorous test. Accordingly, the Court grants the City's motion for summary judgment, enters judgment in its favor, and dismisses with prejudice Mr. Harris's race discrimination claims.

## V. Color Discrimination Claims

Mr. Harris also contends that he was discriminated against based on color. "Color discrimination arises when the particular hue of the plaintiff's skin is the cause of the discrimination, such as in the case where a dark-colored African–American individual is discriminated against in favor of a light-colored African–American individual." *Bryant v. Bell Atl. Maryland, Inc.,* 288 F.3d 124, 135 (4th Cir. 2002); *see Williams v. Wendler,* 530 F.3d 584, 587 (7th Cir. 2008) (same). As the EEOC has explained, "color discrimination occurs when a person is discriminated against based on the lightness, darkness, or other color characteristic of the person. Even though race and color clearly overlap, they are not synonymous." U.S. Equal Emp. Opportunity Comm'n, No. 915.003, EEOC Compliance Manual, Section 15: Race and Color Discrimination, at 6 (Apr. 19, 2006), http://www.eeoc.gov/policy/docs/race-color.pdf; *see also Laws v. Norfolk S. Corp.*, No. 4:15-cv-924-CEJ, 2015 WL 5886069, at *3 (E.D. Mo. Oct. 8, 2015). The elements of a *prima facie* case of color discrimination, and the method by which such a claim is evaluated at the summary judgment stage, are the same as other discrimination claims alleged under Title VII. *See Vega v. Hempstead Union Free School Dist*., 801 F.3d 72, 87 (2d Cir. 2015) (examining the elements of a *prima facie* claim of color discrimination); *Brown-Eagle v. County of Erie, Pa.*, Case No. 12-314 Erie, 2013 WL 5875085, at *4 (W.D. Pa. Oct. 30, 2013) (same).

Mr. Harris's claims of discrimination based on color fail for the same reasons his claims of discrimination based on race fail. He cannot establish a *prima facie* case of discrimination based

on color because he has come forth with no comparator evidence at the *prima facie* case stage. Even if he could establish a *prima facie* case, Mr. Harris fails to demonstrate that the City's legitimate, non-discriminatory reasons for its conduct were pretext and that color discrimination was the real reason motivating the City's actions. The City is entitled to summary judgment on these claims.

## VI.      Religious Discrimination Claims

Mr. Harris also alleges religious discrimination. Title VII prohibits an employer from discriminating against an employee on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1); *see also Brown v. General Motors Corp.,* 601 F.2d 956, 958 n. 1 (8th Cir. 1979). The statute defines the term "religion" to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e (j); *see also Brown,* 601 F.2d at 958 n. 1.

For a Title VII claim premised on religious discrimination to survive a motion for summary judgment, the same general analysis applies. This Court will analyze Mr. Harris's religious discrimination claims under the ***McDonnell Douglas*** burden-shifting framework. *See Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1036-37 (8th Cir. 2005). A discrimination claim based on religion typically requires the plaintiff to show that he was treated less favorably than others because of the plaintiff's religion. *Mann v. Frank,* 7 F.3d 1365, 1370 (8th Cir.1993) (citing *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15 (1977)). Thus, the plaintiff in a disparate treatment case based on religion must prove that he is a member of a protected class and must compare his treatment to that of a similarly situated member of a non-protected class. *Id.* (citing *Hervey v. City of Little Rock,* 787 F.2d 1223, 1231 (8th Cir. 1986)).

In religious discrimination cases under Title VII, some courts, including the Eighth Circuit Court of Appeals, have held that, to establish a *prima facie* case, the employee must also

demonstrate that the employee informed the employer of his or her religious beliefs. *Johnson v. Angelica Uniform Group, Inc.,* 762 F.2d 671, 673 (8th Cir. 1985) (employee who never informed employer of religious beliefs failed to make out *prima facie* case of religious discrimination); *Brown*, 601 F.2d at 959 & n. 4. Therefore, the elements of a *prima facie* case of disparate treatment based on religion are: (1) the plaintiff was a member of a protected class because of the plaintiff's religious affiliation or beliefs; (2) the employee informed the employer of his religious beliefs; (3) the plaintiff was qualified for the position; (4) despite the plaintiff's qualifications, the plaintiff was fired or denied an employment benefit; and (5) similarly situated employees outside the plaintiff's protected class were treated differently or there is other evidence giving rise to an inference of discrimination. *Vetter v. Farmland Indus.*, 884 F. Supp. 1287, 1302 (N.D. Iowa 1995) (reversed on other grounds).

Here, Mr. Harris contends that he was discriminated against or treated differently as a result of his Christian faith and conduct. Even assuming that Mr. Harris is a member of a protected class and that he was meeting the City's legitimate employment expectations, Mr. Harris has not offered any examples of similarly situated employees outside the protected class who were treated differently. In his deposition, Mr. Harris testified that he often quoted Bible scriptures and had an email signature quote of a Bible verse that he was asked to remove. However, he does not identify any other employee outside his protected class who was treated differently in relation to any of the adverse employment actions he contends the City took against him and about which he complains in this lawsuit.

Even if Mr. Harris could establish a *prima facie* case of religious discrimination, he cannot survive the City's motion for summary judgment based on the pretext analysis in regard to any of his claims. Because Mr. Harris has failed to "point to enough admissible evidence to raise genuine

doubt as to the legitimacy of the defendant's motive," he has failed to prove pretext on the part of the City. *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 995 (8th Cir. 2011) (internal quotation marks and citation omitted). Thus, summary judgment in favor of the City on Mr. Harris's religious discrimination claims is proper.

To the extent Mr. Harris's religious discrimination claim can be characterized as a claim of failure to accommodate his religion, such a claim also involves a burden-shifting analysis. In order to establish a *prima facie* case of religious discrimination under 42 U.S.C. § 2000e–2(a)(1) regarding prohibited practices and subsection (j) regarding the accommodation requirement, a plaintiff must plead and prove that: (1) the plaintiff has a *bona fide* belief that compliance with an employment requirement is contrary to his religious faith; (2) the plaintiff informed the plaintiff's employer about the conflict; and (3) the plaintiff was discharged because of the plaintiff's refusal to comply with the employment requirement. *Johnson v. Angelica Uniform Group, Inc.,* 762 F.2d 671, 673 (8th Cir. 1985) (where plaintiff fails the notice requirement of the *prima facie* case, the court need not consider any other element); *Brown*, 601 F.2d at 959. The record evidence, even viewed in the light most favorable to Mr. Harris with all inferences drawn in his favor, does not support such a claim.

For these reasons, the City is entitled to summary judgment on Mr. Harris's religious discrimination claims.

### VII.    Retaliation Claim

Title VII also makes it an unlawful employment practice for an employer to discriminate against its employees for opposing any unlawful employment practice. 42 U.S.C. § 2000e–3(a); *see also Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 977 (8th Cir. 2012). Mr. Harris alleges retaliation (Dkt. No. 2, ¶ 9). The Eighth Circuit Court of Appeals applies the retaliation provisions

of § 2000e–3(a) broadly to cover opposition to employment actions that are not unlawful, as long as the employee acted with a good faith, objectively reasonable belief that the practices were unlawful. *Guimaraes*, 674 F.3d at 977–78.

The Court evaluates Mr. Harris's Title VII retaliation claim under the *McDonnell Douglas* burden-shifting framework. *Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 880 (8th Cir. 2014). To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) he engaged in statutorily protected conduct; (2) he suffered an adverse employment action; and (3) a causal connection exists between the two. *Id.*, at 880 (quoting *Wells v. SCI Mgmt., L.P.*, 469 F.3d 697, 702 (8th Cir. 2006)). Unlike Title VII discrimination claims, for an adverse retaliatory action under Title VII to be "because" a plaintiff opposed an employment action, the plaintiff must plausibly allege that the retaliation was a "but-for" cause of the employer's adverse action. *Blomker v. Jewell*, 831 F.3d 1051, 1059 (8th Cir. 2016). Under Title VII, it is not enough that retaliation was a "substantial" or "motivating" factor in the employer's decision. *Id.* If the plaintiff makes this *prima facie* showing, the employer "must then rebut it 'by presenting evidence of a legitimate, non-retaliatory reason for the action it took against [the plaintiff].'" *Fiero*, 759 F.3d at 880 (quoting *E.E.O.C. v. Kohler*, 335 F.3d 766, 772–73 (8th Cir. 2003)). "If [the employer] satisfies this burden, [the plaintiff] is 'then obliged to present evidence that (1) creates a question of fact as to whether [the employer's] proffered reason was pretextual and (2) creates a reasonable inference that [the employer] acted in retaliation.'" *Id.* (quoting *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002)).

Mr. Harris fails to demonstrate a *prima facie* case of retaliation. The record evidence does not support a reasonable juror finding that Mr. Harris's alleged complaints were the "but-for" cause, or even a motivating cause, of any adverse employment action taken against him. Even if

Mr. Harris could establish a *prima facie* case of retaliation, he fails to demonstrate that the City's legitimate, non-discriminatory reasons for its conduct were pretext and that a retaliatory motive was the real reason for the City's actions. The City is entitled to summary judgment on Mr. Harris's retaliation claim.

**VIII.   Conclusion**

For these reasons, the Court grants the City's motion for summary judgment and enters judgment in favor of the City on Mr. Harris's discrimination and retaliation claims (Dkt. No. 18). Mr. Harris's claims are hereby dismissed with prejudice. Judgment will be entered accordingly.

So ordered this 30th day of August, 2018.

Kristine G. Baker
United States District Judge